# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
POUGHKEEPSIE DIVISION
------------------------------------------------------------------x

In re:


**LARRY WILLIAMS**                                    Case No. 17-36758cgm

        and                                    Chapter 13

**MARILYN Y. WILLIAMS,**

                                                **HON. CECELIA G. MORRIS**

        Debtors.
------------------------------------------------------------------x

## <u>RULE 55 OF THE FEDERAL RULES OF CIVIL PROCEDURE AFFIDAVIT</u>

As attorney for movant admitted to practice before this Court, I represent that upon

information and belief, the debtor is not an infant, incompetent, or in the military.


Dated: May 21, 2018


                               /s/__*Kevin R. Toole*_____
                                  Attorney for Secured Creditor

Department of Defense Manpower Data Center

Results as of : May-18-2018 03:06:59 PM

SCRA 4.4



## Status Report
## Pursuant to Servicemembers Civil Relief Act

SSN:              XXX-XX-9941

Birth Date:

Last Name:        WILLIAMS

First Name:

Middle Name:

Status As Of:     May-18-2018

Certificate ID:   PNSG8QFJ4Q72KMZ

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ? 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q33) via this URL: https://scra.dmdc.osd.mil/faq.xhtml#Q33. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. ? 521(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC ? 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC ? 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC ? 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

Department of Defense Manpower Data Center

SCRA 4.4



## Status Report
## Pursuant to Servicemembers Civil Relief Act

SSN:  XXX-XX-5379
Birth Date:
Last Name:  WILLIAMS
First Name:
Middle Name:
Status As Of:  May-18-2018
Certificate ID:  8YSK9YF84FC7KJC

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ? 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q33) via this URL: https://scra.dmdc.osd.mil/faq.xhtml#Q33. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. ? 521(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC ? 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC ? 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC ? 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

**COMPOSITE EXHIBIT "B"**

MIN

ORIGINAL

# ADJUSTABLE RATE NOTE

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

September 25, 2006                  NEWBURG                     New York
[Date]                              [City]                      [State]

49 RAMBLEWOOD DRIVE, NEWBURG, NY   12550
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $378,000.00                (this amount is called "Principal"), plus interest, to the order of Lender. Lender is New Century Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          6.800 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on November 1, 2006                  .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on 10/01/2036                                , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 18400 Von Karman, Suite 1000, Irvine, CA 92612

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $2,464.28                    . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) - Single Family - **Fannie Mae UNIFORM INSTRUMENT**

**VMP®-838N** (0210)              **Form 3520 1/01**

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 4                  Initials: _____

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of October, 2008 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six And Five Hundredth(s) percentage points ( 6.050 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 8.800 % or less than 6.800 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One And One-half percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.800 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Form 3520 1/01

Initials: *[signature]*

VMP-838N (0210)

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 2.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:



Form 3520 1/01

Initials: _LWFMW._

Page 3 of 4

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_Larry Williams_ _____ (Seal)
LARRY WILLIAMS                    -Borrower

_Marilyn Williams_ _____ (Seal)
MARILYN WILLIAMS                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

*[Sign Original Only]*



-838N (0210)

US Bank National Association as
Trustee for the C-BASS Mortgage
Loan Asset-Backed Certificates,
Series 2007-CB3,without recourse

Pay to the order of, without reccurse

New Century Mortgage Corporation

By: _____

Steve Nagy
V.P Records Management

THIS PAGE IS PART OF THE INSTRUMENT – DO NOT REMOVE

TYPE IN BLACK INK:
NAME(S) OF PARTY(S) TO DOCUMENT

Larry Williams
Marilyn Williams (ux)

TO

"MERS" as nominee for
New Century Mortgage
Corporation

SECTION 17 BLOCK 3 LOT 16

RECORD AND RETURN TO:
(name and address)

New Century Mortgage Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

*THIS IS PAGE ONE OF THE RECORDING*

ATTACH THIS SHEET TO THE FIRST PAGE OF EACH
RECORDED INSTRUMENT ONLY

## DO NOT WRITE BELOW THIS LINE

**INSTRUMENT TYPE:** DEED____MORTGAGE____ X SATISFACTION____ASSIGNMENT____OTHER_____

## PROPERTY LOCATION

| | | |
|---|---|---|
| ___2089 **BLOOMING GROVE (TN)** | ___4289 **MONTGOMERY (TN)** | NO PAGES 24 CROSS REF._____ |
| ___2001 WASHINGTONVILLE (VLG) | ___4201 MAYBROOK (VLG) | CERT.COPY____ADD'L X-REF._____ |
| ___2289 **CHESTER (TN)** | ___4203 MONTGOMERY (VLG) | MAP#_____PGS._____ |
| ___2201 CHESTER (VLG) | ___4205 WALDEN (VLG) | |
| ___2489 **CORNWALL (TN)** | ___4489 **MOUNT HOPE (TN)** | PAYMENT TYPE: CHECK X |
| ___2401 CORNWALL (VLG) | ___4401 OTISVILLE (VLG) | CASH_____ |
| ___2600 **CRAWFORD (TN)** X | ___4600 **NEWBURGH (TN)** X | CHARGE_____ |
| ___2800 **DEERPARK (TN)** | ___4800 **NEW WINDSOR (TN)** | NO FEE_____ |
| ___3089 **GOSHEN (TN)** | ___5089 **TUXEDO (TN)** Taxable | |
| ___3001 GOSHEN (VLG) | ___5001 TUXEDO PARK (VLG) | CONSIDERATION $_____ |
| ___3003 FLORIDA (VLG) | ___5200 **WALLKILL (TN)** | TAX EXEMPT_____ |
| ___3005 CHESTER (VLG) | ___5489 **WARWICK (TN)** Taxable | |
| ___3200 **GREENVILLE (TN)** | ___5401 FLORIDA (VLG) | MORTGAGE AMT. $378,000.00 |
| ___3489 **HAMPTONBURGH (TN)** | ___5403 GREENWOOD LAKE (VLG) | DATE_____ |
| ___3401 MAYBROOK (VLG) | ___5405 WARWICK (VLG) | |
| ___3689 **HIGHLANDS (TN)** | ___5600 **WAWAYANDA (TN)** | **MORTGAGE TAX TYPE:** |
| ___3601 HIGHLAND FALLS (VLG) | ___5889 **WOODBURY (TN)** | ___ (A) COMMERCIAL/FULL 1% |
| ___3889 **MINISINK (TN)** | ___5801 HARRIMAN (VLG) | X (B) 1 OR 2 FAMILY |
| ___3801 UNIONVILLE (VLG) | | ___ (C) UNDER $10,000 |
| ___4089 **MONROE (TN)** | **CITIES** | ___ (E) EXEMPT |
| ___4001 MONROE (VLG) | ___0900 **MIDDLETOWN** | ___ (F) 3 TO 6 UNITS |
| ___4003 HARRIMAN (VLG) | ___1100 **NEWBURGH** | ___ (I) NAT.PERSON/CR. UNION |
| ___4005 KIRYAS JOEL (VLG) | ___1300 **PORT JERVIS** | ___ (J) NAT.PER-CR.UN/1 OR 2 |
| | | ___ (K) CONDO |
| | ___9999 **HOLD** | |

*Donna L. Benson*
**DONNA L. BENSON**
ORANGE COUNTY CLERK

**RECEIVED FROM:** Unique Abstract

RECORDED/FILED
10/17/2006/  16:18:44
County Clerk
DONNA L. BENSON
ORANGE COUNTY, NY

FILE # 20060111962
MORT/BK 12281 PG 0950
SER# CX014888 MTAX 3,939.00
BASIC 1,890.00
MTA  1,104.00
SPECIAL 0.00
SPECIAL ASST 945.00
RECORDING FEES 97.00
Receipt#_____ pete

Return To:
New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612


Prepared By:
New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

——————————————— [Space Above This Line For Recording Data] ———————————————

# MORTGAGE<sub>MIN</sub>


**WORDS USED OFTEN IN THIS DOCUMENT**
**(A) "Security Instrument."** This document, which is dated  September 25, 2006
together with all Riders to this document, will be called the "Security Instrument."
**(B) "Borrower."** LARRY WILLIAMS and MARILYN WILLIAMS, His Wife


*Premises*
Λ

whose address is 49 RAMBLEWOOD DRIVE , NEWBURG, NY 12550

sometimes will be called "Borrower" and sometimes simply "I" or "me."
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and
existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint,
MI 48501-2026, tel. (888) 679-MERS. **FOR PURPOSES OF RECORDING THIS MORTGAGE,
MERS IS THE MORTGAGEE OF RECORD.**
**(D) "Lender."** New Century Mortgage Corporation

will be called "Lender." Lender is a corporation or association which exists under the laws of
California                          . Lender's address is 18400 Von Karman, Suite
1000, Irvine, CA 92612


Section:  17       Block:  3        Lot:  16        Unit:

**NEW YORK** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**          Form 3033 1/01

**VMP** -6A(NY) (0508)
Page 1 of 17                    Initials: *MW / LW*
       VMP Mortgage Solutions, Inc. (800)521-7291


*Property improved by 1 to 2 family dwelling*

**(E) "Note."** The note signed by Borrower and dated    September 25, 2006          , will be called the "Note." The Note shows that I owe Lender THREE HUNDRED SEVENTY-EIGHT THOUSAND AND 00/100

                                        Dollars (U.S. $378,000.00                )
plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by 10/01/2036          .

**(F) "Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."

**(G) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(I) "Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

                                        Prepayment Rider, ARM Rider Addendum

**(J) "Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(K) "Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(L) "Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

**(N) "Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(O) "Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(Q) "RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Initials: _MHW JBW_

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

## DESCRIPTION OF THE PROPERTY

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

(A) The Property which is located at 49 RAMBLEWOOD DRIVE

[Street]

NEWBURG                         [City, Town or Village], New York 12550          [Zip Code].

This Property is in Orange                                County. It has the following legal description: See Legal Description Attached Hereto and Made a Part Hereof

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

# Schedule A Description

Title Number:                          Policy Number:                          Page    **1**

ALL that certain plot, piece or parcel of land situate lying and being in the town of
Newburgh, Orange County, New York, designated as Lot No. 40 on a certain
map entitled, "Fostertown Crossing, Section 4", prepared by Eustance and
Horowitz, P.C. filed in the Office of Orange County Clerk on November 24, 1999
as Filed Map No. 264-99.

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

**(a) Borrower's Obligations.**

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

VMP®-6A(NY) (0508)                    Page 6 of 17        Initials: _____        Form 3033 1/01

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) Lender's Obligations.

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) Adjustments to the Escrow Funds.

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security

Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period

Initials: _MW/LN_

that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.**

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

**(b) Lender's Inspection of Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

VMP®-6A(NY) (0508)                     Page 8 of 17          Initials: _____          Form 3033 1/01

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance

Initials:

coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in

-6A(NY) (0508)                          Page 10 of 17          Initials:                    Form 3033 1/01

value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.**

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.**

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to

delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.

Initials: _M/W Lw_

If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If

Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."**

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another

Initials:

Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

23. **Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24. **Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25. **Borrower's Statement Regarding the Property [check box as applicable].**

[X] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

[ ] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Security Instrument does not cover real property improved as described above.

Initials: _MW/BW_

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____          *Larry Williams*          _____ (Seal)
                                            LARRY WILLIAMS                      -Borrower


_____          *Marilyn Williams*          _____ (Seal)
                                            MARILYN WILLIAMS                     -Borrower


_____ (Seal)          _____ (Seal)
                    -Borrower                               -Borrower


_____ (Seal)          _____ (Seal)
                    -Borrower                               -Borrower


_____ (Seal)          _____ (Seal)
                    -Borrower                               -Borrower

STATE OF NEW YORK,                                    *Nassau*    County ss:


On the _25_ day of _September_ _2006_ before me, the undersigned, a notary
public in and for said state, personally appeared


*Larry Williams and Marilyn Williams*

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the
individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public


Tax Map Information:

Assessor's Parcel Number:

BRIAN P. NELSON
Notary Public, State of New York
No. 1NE6064026
Qualified in Suffolk County
Commission Expires on September 17, 20*07*

Initials:

MIN:

# ADJUSTABLE RATE RIDER

*(LIBOR Six-Month Index (As Published In The Wall Street Journal) - Rate Caps)*

THIS ADJUSTABLE RATE RIDER is made this 25th   day of September, 2006   ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
New Century Mortgage Corporation

("Lender") of the same date and covering the property described in the Security Instrument
and located at: 49 RAMBLEWOOD DRIVE, NEWBURG, NY  12550

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of          6.800 %. The Note provides
for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of October, 2008      ,
and on that day every 6th          month thereafter. Each date on which my interest rate
could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for six month U.S. dollar-denominated
deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most
recent Index figure available as of the first business day of the month immediately preceding
the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based
upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
Six And Five Hundredth(s)                          percentage points
(          6.050 %) to the Current Index. The Note Holder will then round the result of

**MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN
THE WALL STREET JOURNAL)** - Single Family - Fannie Mae Uniform Instrument
-838R (0402)  Form 3138 1/01
Page 1 of 3        Initials:
VMP Mortgage Solutions, Inc.
(800)521-7291

this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than ____ 8.800 % or less than ____ 6.800 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One And One-half ____ percentage points ( ____ 1.500 %) from the rate of interest I have been paying for the preceding 6 ____ months. My interest rate will never be greater than ____ 13.800 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Initials:

-838R (0402)                    Page 2 of 3                    Form 3138 1/01

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____(Seal)
LARRY WILLIAMS          -Borrower          MARILYN WILLIAMS          -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower


VMP®-838R (0402)                    Page 3 of 3                    Form 3138 1/01

MIN:

# ADJUSTABLE RATE RIDER ADDENDUM
### (Libor Index - Rate Caps)

This Adjustable Rate Rider Addendum is made this **25th** day of **September    2006**    ,
and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") and Adjustable Rate Rider (the
"Rider") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's
Note to

**New Century Mortgage Corporation**                                    (the "Lender").

Property securing repayment of the Note is described in the Security Instrument and located at:
**49 RAMBLEWOOD DRIVE, NEWBURG, NY  12550**
(Property Address)

To the extent that the provisions of this Adjustable Rate Rider Addendum are inconsistent with the
provisions of the Note and/or Security Instrument and/or Rider, the provisions of this Addendum shall
prevail over and supersede any such inconsistent provisions of the Note and/or Security Instrument and/or
Rider.

In addition to the covenants and agreements made in the Note, Security Instrument, and Rider, Borrower and
Lender further covenant and agree as follows:

**4.    (D) LIMITS ON INTEREST RATE CHANGES**
     The interest rate I am required to pay at the first change date will not be greater than
          **8.800** % or less than          **6.800** %.  Thereafter,  my  interest  rate
will   never   be   increased   or   decreased   on   any   single   Change   Date   by   more   than
**One And One-half**                                              **1.500**%) from
the rate of interest I have been paying for the preceding  **6**  months. My interest rate will never be
greater than          **13.800** % or less than          **6.800** %.

BY  SIGNING  BELOW,  Borrower  accepts  and  agrees  to  the  terms  and  covenants  contained  in  this
Adjustable Rate Rider Addendum.

_Larry Williams_                              _Marilyn Williams_
LARRY WILLIAMS                         MARILYN WILLIAMS

NCMC
Adjustable Rate Rider Addendum
RE-102    (082296)              Page 1 of 1

MIN:

# PREPAYMENT RIDER
## ADJUSTABLE RATE LOAN

This Prepayment Rider is made this 25th        day of September       2006        , and is incorporated into
and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
repayment of Borrower's Note to

New Century Mortgage Corporation                                        (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note and/or
Security Instrument, the provisions of this rider shall prevail over and shall supersede any such inconsistent
provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender
further covenant and agree as follows:

## 5.  BORROWERS RIGHT TO PREPAY

      I have the right to make payments of Principal at any time before they are due.  A prepayment of all
of the unpaid principal is known as a "Full Prepayment."  A prepayment of only part of the unpaid
principal is known as a "Partial Prepayment."

      Except as provided below, I may make a Full or Partial Prepayment without paying any penalty.  If
I make a Partial Prepayment equal to one or more of my monthly payments, my due date may be advanced
no more than one month.  If I make any other Partial Prepayment, I must still make each later payment as it
becomes due and in the same amount.  I may make a Full Prepayment at any time.  However, if within the
first twelve (12) months after the execution of the Mortgage, I make any prepayment(s), the total amount of
which exceeds TWENTY  PERCENT (20 %) of the original Principal amount of this loan, I will pay a
prepayment charge in an amount equal to the payment of Six ( 6 ) months' advance interest on the amount by
which the total of my prepayment(s) within that 12-month period exceeds  TWENTY PERCENT (20 %) of
the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment
Rider.

_Larry Williams_                          _Marilyn Williams_

**LARRY WILLIAMS**                        **MARILYN WILLIAMS**



# ORANGE COUNTY – STATE OF NEW YORK
### ANN G. RABBITT, COUNTY CLERK
### 255 MAIN STREET
### GOSHEN, NEW YORK 10924

---

## COUNTY CLERK'S RECORDING PAGE
### ***THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH***

---

Recording:

| | |
|---|---:|
| Recording Fee | 30.00 |
| Cross References | 0.50 |
| Cultural Ed | 14.25 |
| Records Management – Coun | 1.00 |
| Records Management – Stat | 4.75 |

BOOK/PAGE:  14327 / 1790
INSTRUMENT #:  20170085500

Total:                                    50.50
**** NOTICE: THIS IS NOT A BILL ****

Receipt#: 2415065
Clerk:    JMCG
Rec Date: 11/29/2017 01:28:31 PM
Doc Grp:  RP
Descrip:  AST
Num Pgs:  2
Rec'd Frm: Security Connections, Inc

Party1:   NEW CENTURY MTG CORP   BY NOM
Party2:   US BANK NATIONAL ASSN   TR
Town:     MISCELLANEOUS
          17-3-16

Payment Type:        Check ___
                     Cash ___
                     Charge ___
                     No Fee ___

Comment: _____

Ann G. Rabbitt
Orange County Clerk

Record and Return To:

ELECTRONICALLY RECORDED BY INGEO

Recording Requested By:
OCWEN LOAN SERVICING, LLC

When Recorded Return To:

OCWEN LOAN SERVICING, LLC
1795 INTERNATIONAL WAY
IDAHO FALLS, ID  83402

**CORPORATE ASSIGNMENT OF MORTGAGE**
Orange, New York
**SELLER'S SERVICING #**              "WILLIAMS"
**SELLER'S LENDER ID#:**
**OLD SERVICING #:**

Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR
NEW CENTURY MORTGAGE CORPORATION, ITS SUCCESSORS AND/OR ASSIGNS at  PO BOX 2026 FLINT MI
48501, 1901 E VOORHEES ST, STE C, DANVILLE, IL 61834

Assignee: U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE C-BASS MORTGAGE LOAN
ASSET-BACKED CERTIFICATES, SERIES 2007-CB3 at C/O OCWEN LOAN SERVICING, LLC., 1661
WORTHINGTON RD, SUITE 100, WEST PALM BEACH, FL  33409

Executed By: LARRY WILLIAMS AND MARILYN WILLIAMS HIS WIFE  To: MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR NEW CENTURY MORTGAGE
CORPORATION, ITS SUCCESSORS AND/OR ASSIGNS
Date of Mortgage:  09/25/2006 Recorded:  10/17/2006  in Book/Reel/Liber: 12281 Page/Folio: 0950 as Instrument
No.: 20060111962  In the County of Orange, State of New York.

Section/Block/Lot 17-3-16

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC has a physical address at 1901 E Voorhees Street,
Suite C, Danville, IL 61834 and a mailing address at P.O. BOX 2026, FLINT, MI 48501-2026

Property Address: 49 RAMBLEWOOD DRIVE, NEWBURG, NY 12550

    This Assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an
assignment within the secondary mortgage market.

    KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said
Mortgage having an original principal sum of $378,000.00 with interest, secured thereby, and the full benefit of all the
powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys
unto the said Assignee, the Assignor's interest under the Mortgage.

    TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the
terms contained in said Mortgage.  IN WITNESS WHEREOF, the assignor has executed these presents the day and
year first above written:

  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR NEW
CENTURY MORTGAGE CORPORATION, ITS SUCCESSORS AND/OR ASSIGNS
On     **NOV 1 0 2017**

By: _____
      Radhame Nunez            , Assistant
Secretary


STATE OF FLORIDA
COUNTY OF PALM BEACH

On the _____ 10th _____ day of _November_ in the year _2017_ before me, the undersigned,
personally appeared _____ Radhame Nunez _____, Assistant Secretary, personally known to me or proved to
me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by
his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s)
acted, executed the instrument, and that such individuals(s) made such appearance before the undersigned in the
County of PALM BEACH, State of FLORIDA

WITNESS my hand and official seal,

_____
      Brittany M Harris
Notary Expires:      SEP 1 8 2020
State of FLORIDA County of PALM BEACH

Notary Public State of Florida
Brittany M Harris
My Commission GG 031112
Expires 09/18/2020

(This area for notarial seal)

Loan Number:
Investor Loan Number:
MIN Number:

This document was prepared by Ocwen Loan Servicing, LLC

**After Recording Return To:**
Ocwen Loan Servicing, LLC
Attention: Modification Processing
PO Box 24737
West Palm Beach, FL 33416-9838
_____ [Space Above This Line For Recording Data] _____

## LOAN MODIFICATION AGREEMENT

Borrower (s):  Marilyn Williams, Larry Williams

<u>THIS IS A BALLOON MORTGAGE AND THE FINAL PRINCIPAL PAYMENT OR THE PRINCIPAL BALANCE DUE UPON MATURITY IS $99.66, TOGETHER WITH ACCRUED INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THIS MORTGAGE.</u>

**BALLOON PAYMENT DISCLOSURE**
THIS MODIFICATION AGREEMENT INCLUDES A BALLOON PAYMENT, WHICH MEANS THAT EVEN IF YOU MAKES ALL THE SCHEDULED PAYMENTS WHEN DUE, THE LOAN WILL NOT BE PAID IN FULL AT THE END OF ITS TERM. AS A RESULT, ON THE MATURITY DATE OUTLINED WITHIN THIS AGREEMENT, YOU WILL BE REQUIRED TO REPAY, IN  A SINGLE PAYMENT, THE ENTIRE REMAINING PRINCIPAL BALANCE PLUS ALL ACCRUED BUT UNPAID INTEREST AND ALL OTHER AMOUNTS OWING ON THAT DATE (INCLUDING BUT NOT LIMITED TO  ALL ADVANCES MADE BY LOAN SERVICER UNDER THE TERMS OF THE SECURITY INSTRUMENT).

*CAUTION TO BORROWER: NO OBLIGATION TO REFINANCE* – LOAN SERVICER HAS NO OBLIGATION TO REFINANCE THIS LOAN OR MAKE YOU A NEW LOAN ON THE MATURITY DATE. If YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN AGAINST THE PROPERTY TO MAKE THE BALLOON PAYMENT. ASSUMING ANOTHER LENDER MAKES YOU A NEW LOAN ON THE MATURITY DATE, YOU WILL PROBABLY BE CHARGED INTEREST AT THE MARKET RATE PREVAILING AT THAT TIME.  SUCH INTEREST RATE MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS LOAN.  YOU MAY AGAIN HAVE TO PAY COMMISSIONS, FEES AND EXPENSES FOR THE ARRANGING OF THE NEW LOAN.  IN ADDITION, IF YOU ARE UNABLE TO MAKE THE MONTHLY PAYMENTS OR THE BALLOON PAYMENT, YOU MAY LOSE THE PROPERTY AND ALL OF THE EQUITY THROUGH FORECLOSURE. KEEP THIS IN MIND IN DECIDING WHETHER TO AGREE TO THE TERMS OF THIS LOAN MODIFICATION.

The debtor, Marilyn Williams, Larry Williams, and U.S. Bank National Association, as Trustee, for the C-BASS Mortgage Loan Asset-Backed Certificates, Series 2007-CB3 through the servicer of the underlying mortgage loan agreement, Ocwen Loan Servicing, LLC, have agreed to modify the terms of said underlying mortgage loan agreement. U.S. Bank National Association, as Trustee, for the C-BASS Mortgage Loan Asset-Backed Certificates, Series 2007-CB3 is the owner of the loan and retains all rights to collect payments as per the underlying mortgage loan agreement. Ocwen Loan Servicing, LLC, remains servicer for said underlying mortgage loan agreement.

This Loan Modification Agreement ("Agreement"), made this 14th day of August, 2017, between Marilyn Williams, Larry Williams ("Borrower") and Ocwen Loan Servicing, LLC, Lender/Servicer or Agent for Lender/Servicer ("Lender"), and Mortgage Electronic Registration Systems, Inc.("MERS") ("Beneficiary"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated 09/25/2006 and recorded in the Records of Orange County, NY and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

49 Ramblewood Dr
Newburgh, NY 12550

The real property described being set forth as follows:

**(Legal Description Attached, if applicable, for Recording Only)**

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

## Representations:

1. Borrower is experiencing a financial hardship and as a result, 1) is or will be in default under the Loan Documents and 2) does not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments due under the Loan Documents.
2. Under penalty of perjury, if required by the Lender, borrower provided Lender with full and complete information that, when provided, accurately stated borrower's income, expenses, and assets. To the extent requested by Lender, borrower provided documents that supported that information.
3. Borrower has made any and all required trial period plan payments or down payments.
4. Borrower currently has sufficient income to support the financial obligations under the Loan Documents, as modified by this Agreement.
5. Borrower understands that property title may be reviewed as a precondition to the modification.

## Acknowledgements and Preconditions to the Modification:

1. Lender has no obligation to make any modification of the Loan Documents if any of the requirements under this Agreement are not met.
2. Prior to the Modification Effective Date (defined as 08/01/2017), if Lender determines that any of the representations above are no longer true and correct, 1) the Loan Documents will not be modified, 2) this Agreement will not be valid, and 3) Lender will have all of the rights and remedies provided by the Loan Documents.
3. The Loan Documents will not be modified unless and until 1) Lender approves this Agreement and 2) the Modification Effective Date has occurred.

## Modified Loan Terms:

1. If all of Borrower's representations above continue to be true and correct and all preconditions to the modification set forth above have been met, the Loan Documents will automatically become modified on 08/01/2017. If Borrower has failed to make any payments that are a precondition to this modification or receipt of clear title is not received, this modification will not take effect.

The new Maturity Date will be 09/01/2038.

Borrower understands that in order to reach an affordable payment under this modification, the loan may have been re-

amortized beyond the maturity date. This means that if all payments are made in accordance with the loan terms, when Borrower reaches the maturity date, there will be an outstanding amount still due.

This amount includes a non-interest bearing deferment amount of $99.66 ("Balloon Payment") which is due when the loan reaches maturity, sold, refinanced or otherwise accepted by the Lender as paid in full. Borrower specifically acknowledges that this is a balloon modification and therefore Borrower will have a balloon payment due at maturity in the approximate amount of $99.66.

**BALLOON PAYMENT: THIS MORTGAGE LOAN CONTAINS A BALLOON PAYMENT PROVISION. A BALLOON PAYMENT IS A SCHEDULED LUMP SUM USUALLY DUE AT THE END OF THE MORTGAGE LOAN TERM THAT IS SIGNIFICANTLY LARGER THAN THE OTHER REGULARLY SCHEDULED PERIODIC PAYMENTS. IF YOU CANNOT PAY THE BALLOON PAYMENT WHEN DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN TO MAKE THE BALLOON PAYMENT OR YOU MAY LOSE YOUR PROPERTY THROUGH FORECLOSURE. BEFORE DECIDING TO TAKE THIS LOAN, CONSIDER YOUR ABILITY TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE.  THE BALLOON PAYMENT ON THE MORTGAGE LOAN YOU HAVE APPLIED FOR IS DUE 253 MONTHS FROM THE DATE YOUR MORTGAGE LOAN BEGINS.**

**CAUTION TO BORROWER: IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN DUE, IT MAY BE NECESSARY FOR YOU TO OBTAIN A NEW LOAN AGAINST YOUR PROPERTY FOR THIS PURPOSE AND YOU MAY BE REQUIRED TO AGAIN PAY COMMISSION AND EXPENSES FOR ARRANGING THE LOAN. KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS OF THE LOAN THAT YOU OBTAIN AT THIS TIME.**

2.  The current Unpaid Principal Balance is $317,826.96. The New Principal Balance of the Note will be $304,950.00 (the "New Principal Balance"). This includes all amounts and arrearages that are past due as of the Modification Effective Date (including but not limited to unpaid and any previously deferred principal and interest, fees, escrow advances and other costs, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to the Loan. $17,514.35 of the Unpaid Principal Balance shall be forgiven upon successful completion of the final modification, and will no longer be due and owing, and is not included in the New Principal Balance. The New Principal Balance may represent the sum of the "Deferred Principal Balance" (if applicable) and the "Interest Bearing Principal Balance." The Interest Bearing Principal Balance is $304,850.34.  Borrower understands that by agreeing to add the Unpaid Amounts to the Unpaid Principal Balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. Borrower also understands that this means interest will now accrue on the unpaid interest that is added to the New Principal Balance, which would not happen without this Agreement.

3.  Borrower promises to pay the New Principal Balance, plus interest, and any future fees/costs to the order of the Lender. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 4%, beginning 08/01/2017.  Borrower promises to make monthly payments of principal and interest of U.S. $1,785.50, beginning on 09/01/2017 and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full.  Borrower promises to also pay any applicable monthly escrow payments as outlined in this Agreement.  The initial monthly escrow amount is $1,161.05. The yearly rate of 4% will remain in effect until principal and interest are paid in full.  If on 09/01/2038 (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower agrees to pay in full all amounts still owed under the Note and the Security Instrument by the earliest of: (i) The date Borrower sells or transfers an interest in the Property, (ii) The date Borrower pays the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

4.  $99.66 of the New Principal Balance shall be deferred ("Deferred Principal Balance") and Borrower will not pay interest or make monthly payments on this amount.  The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $304,850.34. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 4%, from 08/01/2017. Borrower promises to make monthly payments of principal and interest of U.S. $1,785.50, beginning on 09/01/2017, and continuing thereafter on the same day of each succeeding month until the Interest Bearing Principal Balance and all accrued interest thereon have been paid in full. The yearly rate of 4% will

remain in effect until the Interest Bearing Principal Balance and all accrued interest thereon have been paid in full. Borrower promises to also pay any applicable monthly escrow payments as outlined in this agreement. The initial monthly escrow amount is $1,161.05. Upon 09/01/2038 (the "Maturity Date"), Borrower will still owe amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. If on 09/01/2038, Borrower still owes amounts under the Note and Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower agrees to pay in full the Deferred Principal Balance and any other amounts still owed under the Note and the Security Instrument by the earliest of: (i) The date Borrower sells or transfers an interest in the Property, (ii) The date Borrower pays the entire Interest Bearing Principal Balance, or (iii) the Maturity Date. Borrower specifically acknowledges that this is a balloon modification and therefore Borrower will have a balloon payment due at maturity in the approximate amount of $99.66.

The initial monthly escrow amount is $1,161.05. The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

Borrower's payment schedule for the modified Loan is as follows:

| Years | Interest Rate (%) | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* (adjusts periodically) | Total Monthly Payment* (adjusts periodically) | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1 - 21.08 | 4 | 08/01/2017 | $1,785.50 | $1,161.05 | $2,946.55 | 09/01/2017 | 253 |

*The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

**Additional Agreements:**

1. **Transfer of Property.** If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

2. **Original Loan Document Conditions.** Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument and Note, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument and Note; however, if applicable, the following terms and provisions are forever canceled, null and void, as of 08/01/2017:

   a. all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and

   b. all terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

3. Borrower understands and agrees that:

a.  **Default Under the Modification.** All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

b.  **Original Loan Document Conditions.** All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender. Borrower agrees that the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

c.  **Modification Does Not Constitute Release.** Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

d.  **Costs and Expenses.** All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender or not permitted per State or federal law.

e.  **Agreement to Provide Any Additional Modification Documents.** Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower. Borrower will execute such other documents as may be reasonably necessary to correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. Borrower understands that either a corrected Agreement or a letter agreement containing the correction will be provided to Borrower for Borrower's signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If Borrower elects not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement. Borrower agrees to deliver any such corrective documents within ten (10) days after Borrower receives the Lender's written request for such replacement.

f.  **MERS.** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns. **MERS is the [Mortgagee] [Beneficiary] of record under the Security Instrument and this Agreement.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. MERS also has a street address of 1901 Voorhees Street, Suite C, Danville, IL 61834.In the cases where the loan has been registered with MERS who has only legal title to the interests granted by the Borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage Loan.

g.  **Agreement of Use of Non-Public Information.** Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's loan. For purposes of this section, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan.

h. **Consent to Contact.** Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan including the trial period plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

4. **Escrow Account.** By this section, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked and Borrower has been advised of the amount needed to fully fund the Escrow Account.

Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

5. **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

6. **Inclusion of Exhibits.** Borrower authorizes Lender to attach an Exhibit A to this Agreement, which may include a Legal Description, recording information of the original security instrument, and any other relevant information required by a County Clerk (or other recordation office) to allow for recording if and when Lender seeks recordation.

7. **Errors and Omissions.** That if any documents related to the loan documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, Borrower will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. All documents the Lender requests of Borrower under this section shall be referred to as "Documents." Borrower agrees to deliver the Documents within ten (10) days after Borrower receives the Lender's written request for such replacement. At Lender's option, this Agreement will be void and of no legal effect and the loan terms will revert to the terms prior to the approved modification.

8. **Final Agreement.** This Agreement may not be supplemented, changed, modified or omitted except by written document executed by both the Lender and the Borrower. This Modification constitutes the entire agreement between the Lender and Borrower and supersedes all previous negotiations and discussions between the Borrower and the Lender and neither prior evidence nor any prior or other agreement shall be permitted to contradict or vary its terms. There are no promises, terms, conditions, or obligations other than those contained in this Agreement.

9. **Additional Events of Default**. Without limiting the other events of default set forth in the Loan Documents, Borrower will be in default under this Agreement and under the Loan Documents upon the occurrence of any one or more of these events:
   a. Any material representation or warranty made by you in the Loan Documents, this Agreement, or any initial agreement proves to be false or misleading in any respect.

   b. Borrower fails to make the New Monthly Payments as required by this Agreement.

   c. Borrower sells or conveys any interest in the Property without Lender's prior written consent.

   d. Breach of any of the terms or provisions of this Agreement.

10. **Consequences of Default.** If Borrower defaults under this Agreement or the Loan Documents after the Modification Effective Date (your "Default"), Lender may, in addition to the remedies provided by the Loan Documents, subject only to applicable law, institute any foreclosure or collection proceedings without prejudice for having accepted any payments, including but not limited to the New Monthly Payments, under this Agreement and exercise any of its rights and remedies against Borrower under the Loan Documents and/or this Agreement.

11. **Mortgage Insurance.** Borrower understands that the mortgage insurance premiums on the Loan, if applicable, may increase as a result of the capitalization which may result in a higher total monthly payment. Furthermore, the date on which Borrower may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

12. **Credit Reporting.** Lender is required to report factual information to the credit reporting agencies. Lender may report information about the account to credit bureaus. Late payments, missed payments, or other defaults on the account may be reflected in the credit report.

13. **No Novation.**  Borrower expressly agrees that this Agreement is not a new loan from Lender but simply the modification of the existing obligations under the Loan Documents.  Neither Borrower nor Lender has any intention to extinguish or discharge the indebtedness or the liens evidenced by the Loan Documents.

## BORROWER ACKNOWLEDGEMENT

**IMPORTANT – Do NOT sign this Agreement unless you are in the presence of a notary. If extenuating circumstances prevent one notary signature, separately signed and notarized agreements will be accepted; however, the agreements must be returned in the same package to Ocwen Loan Servicing.**

Each of the Borrower(s) and the Lender acknowledge that no representations, agreements or promises were made by the other party or any of its representatives other than those representations, agreements or promises specifically contained herein.  This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

All individuals on the mortgage, note and the property title must sign this Agreement.

| Date | 8-24-17 | Marilyn Williams |
| --- | --- | --- |
| Date | 8-24-17 | Larry Williams |

**UNIFORM FORM CERTIFICATE OF ACKNOWLEDGEMENT**

State of New York

County of _____

On the _____ day of _____ in the year _____, before me, the undersigned, personally
appeared _____, personally known to me or
proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by
his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted,
executed the instrument.

_____
Notary Public

_____
Printed Name

My Commission Expires:

_____

SUSAN MERCER
NOTARY PUBLIC, STATE OF NEW YORK
No. 01ME6016707
Qualified in Suffolk County
Commission Expires  11/30/2018

## LENDER ACKNOWLEDGEMENT

### (For Lender's Signature Only)

Lender acknowledges that no representations, agreements or promises were made or any of its representations other than those representations, agreements or promises specifically contained herein. This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

Ocwen Loan Servicing

_____

Mortgage Electronic Registration Systems, Inc.
Nominee for Lender, its successors and assigns

**Desmond Cummings**
**Assistant Secretary**
_____

Date       SEP 2 1 2017

State of _____

County of _____

On this ___ day of _____, _____, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ of Mortgage Electronic Registration Systems Inc., Nominee for Lender, its successors and assigns, said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public

My Commission Expires: _____

# EXHIBIT "C"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
POUGHKEEPSIE DIVISION

IN RE:                                              CASE NO.: 17-36758-cgm
                                                    CHAPTER 13
LARRY WILLIAMS

    Debtor

    and

MARILYN Y. WILLIAMS,

    Joint Debtor.

_____/

## AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY

    I, _____Javier Rivera_____, declare under penalty of perjury as follows:

1. I am employed as a _____Contract Management Coordinator____ of OCWEN LOAN SERVICING, LLC, and am authorized to sign this affidavit on behalf of OCWEN LOAN SERVICING, LLC as servicer for U.S. Bank National Association, as Trustee, for the C-BASS Mortgage Loan Asset-Backed Certificates, Series 2007-CB3 (the "Movant"). This affidavit is provided in support of the Motion for Relief from Stay (the "Motion") filed contemporaneously herewith.

2. I make this affirmation based upon my review of the records with regard to this underlying loan transaction, which are kept in the ordinary course of business of OCWEN LOAN SERVICING, LLC. As part of my job responsibilities for OCWEN LOAN SERVICING, LLC, I have personal knowledge of and am familiar with the types of records maintained by OCWEN LOAN SERVICING, LLC in connection with the loan that is the subject of the Motion (the "Loan") and the procedures for creating those types of records. I have access to and have reviewed the books, records and files of OCWEN LOAN SERVICING, LLC, that pertain to the Loan and extensions of credit given to Debtors concerning the property securing such Loan.



17-104629 - KaV



PAGE 1

3. The information in this affidavit is taken from OCWEN LOAN SERVICING, LLC'S business records regarding the Loan. The records are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge; (b) kept in the course of OCWEN LOAN SERVICING, LLC's regularly conducted business activities; and (c) it is the regular practice of OCWEN LOAN SERVICING, LLC, to make such records.

4. The Debtor and Joint Debtor AKA Marilyn Williams have executed and delivered or are otherwise obligated with respect to that certain promissory note referenced in the Motion (the "Note"). The Debtor and Joint Debtor AKA Marilyn Williams have executed and delivered or are otherwise obligated with respect to that certain Mortgage referenced in the Motion (the "Mortgage"). Pursuant to that certain Mortgage referenced in the Motion (the "Mortgage"), all obligations of the Debtors under and with respect to the Note and the Mortgage are secured by the property referenced in the Motion.

5. As of May 7, 2018, there are one or more defaults in paying Debtors post-petition amounts due with respect to the Note.

6. As of May 7, 2018, the total unpaid principal balance is $302,634.30 which includes the unpaid principal balance of $302,534.64 and deferred principal balance of $99.66.

7. The following chart sets forth those post-petition payments, due pursuant to the terms of the Note, that have been missed by the Debtors as of May 7, 2018:

| Number of Missed Payments | From | To | Monthly Missed Principal and Interest | Monthly Missed Escrow (if applicable) | Monthly Optional Products | Monthly Payment Amount | Total Amounts Missed |
|---|---|---|---|---|---|---|---|
| 5 | 01/01/18 | 05/01/18 | $1,785.50 | $1,079.53 | $21.57 | $2,886.60 | $14,433.00 |
| Less post-petition partial payments (suspense balance): | | | | | | | $181.62 |

Total:     **$14,251.38**

17-104629 - KaV

PAGE 2

8.  As of May 7, 2018, the total post-petition arrearage/delinquency is $15,151.38, consisting of
    (i) the foregoing total of missed post-petition payments in the amount of $14,251.38, plus (ii)
    the following post-petition fees:

| Description | Amount |
|---|---|
| Proof of Claim | $500.00 |
| Review of Plan and Notice of Appearance | $150.00 |
| Payment History Review Fee | $250.00 |

9.  Attached hereto as Exhibit "1" is a post-petition payment history.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of
the United States of America that the foregoing is true and correct.

Executed this 15th day of May , 2018 .

Signature: _Javier Rivera_

Name: _Javier Rivera_

Title: _Contract Management Coordinator_

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 15th day of May , 20 18, by
___Javier Rivera___ as ___Contract Management Coordinator___ for Ocwen Loan Servicing, LLC who
is the servicer for U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE C-
BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2007-CB3, who is
personally known to me or who has produced _____ as identification.

_Marilyn Solivan_
Signature of Notary Public
Name of Notary Public: ___Marilyn Solivan___

Personally known: __✓__
OR Produced Identification: __—__
Type of Identification Produced: __—__

Notary Public State of Florida
Marilyn Solivan
My Commission FF 987302
Expires 04/28/2020

17-104629 - KaV

PAGE 3

**EXHIBIT 1**

Post-Petition Payment History:

| Name: | Larry Williams | | | | | |
|---|---|---|---|---|---|---|
| BK Case Number: | 17-36758-cgm | | | | | |
| Filing Date: | 10/18/2017 | | | | | |
| Post First Due: | 11/1/2017 | | | Completed By: | jnarasim | |
| Post-Petition Due | Date Received | Amount Received | Amount Applied | Suspense Application | Suspense Balance | Comments |
| 11/1/2017 | 11/30/2017 | $  2,946.55 | $  2,886.60 | $  59.95 | $  59.95 | $21.57 applied to Opt Ins |
| 12/1/2017 | 12/17/2017 | $  3,008.27 | $  2,886.60 | $  121.67 | $  181.62 | $21.57 applied to Opt Ins |

Post-Petition Payments Due:

| Name: | Larry Williams | | | | | |
|---|---|---|---|---|---|---|
| BK Case Number: | 17-36758-cgm | | | | | |
| Filing Date: | 10/18/2017 | | | | | |
| Completed by: | jnarasim | | | | | |
| Due Date | Total Payment | Principal | Interest | Escrow | Optional Products | NOPC Filed Date |
| 1/1/2018 | $  2,886.60 | $  779.64 | $ 1,005.86 | $ 1,079.53 | $  21.57 | |
| 2/1/2018 | $  2,886.60 | $  782.24 | $ 1,003.26 | $ 1,079.53 | $  21.57 | |
| 3/1/2018 | $  2,886.60 | $  784.85 | $ 1,000.65 | $ 1,079.53 | $  21.57 | |
| 4/1/2018 | $  2,886.60 | $  787.46 | $  998.04 | $ 1,079.53 | $  21.57 | |
| 5/1/2018 | $  2,886.60 | $  790.09 | $  995.41 | $ 1,079.53 | $  21.57 | |
| Total Due | $  14,433.00 | $ 3,924.28 | $ 5,003.22 | $ 5,397.65 | $ 107.85 | |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

IN RE:

LARRY WILLIAMS

     and

MARILYN Y. WILLIAMS,

     Debtors.

CASE NO.: 17-36758-cgm
CHAPTER 13

-------------------------------------------------------------X

## RELIEF FROM STAY - REAL ESTATE AND COOPERATIVE APARTMENTS

I,      Javier Rivera      Contract Management Coordinator

OF  Ocwen Loan Servicing, LLC as servicer for U.S. Bank National Association, as Trustee, for the
C-BASS Mortgage Loan Asset-Backed Certificates, Series 2007-CB3 (HEREINAFTER, "MOVANT"),
HEREBY DECLARE (OR CERTIFY, VERIFY, OR STATE):

### BACKGROUND INFORMATION

1. REAL PROPERTY OR COOPERATIVE APARTMENT ADDRESS WHICH IS THE SUBJECT OF THIS

MOTION: 49 Ramblewood Drive Newburg, New York 12550

2. LENDER NAME: U.S. Bank National Association, as Trustee, for the C-BASS Mortgage Loan Asset-
Backed Certificates, Series 2007-CB3

3. DATE OF MORTGAGE: September 25, 2006

4. POST-PETITION PAYMENT ADDRESS: Ocwen Loan Servicing, LLC Attention: Cashiering Department, 1661
Worthington Road, Suite 100 West Palm Beach, FL 33409

### DEBT/VALUE REPRESENTATIONS

5. TOTAL PRE-PETITION AND POST-PETITION INDEBTEDNESS OF DEBTOR(S) TO MOVANT AT THE TIME OF

FILING THE MOTION: $314,061.21 (as of May 7, 2018)

(Note: this amount may not be relied on as a "payoff" quotation.)

6. MOVANT'S ESTIMATED MARKET VALUE OF THE REAL PROPERTY OR COOPERATIVE APARTMENT:
$299,700.00

7.  SOURCE OF ESTIMATED VALUATION: County Tax Valuation

---

### STATUS OF DEBT AS OF
### THE PETITION DATE

8.  TOTAL PRE-PETITION INDEBTEDNESS OF DEBTOR(S) TO MOVANT AS OF PETITION FILING DATE:
$301,680.40

| | |
|---|---|
| A. | AMOUNT OF PRINCIPAL: $304,081.01 |
| | DEFERRED PRINCIPAL: $99.66 |
| B. | AMOUNT OF INTEREST:  $1,587.98 |
| C. | AMOUNT OF ESCROW (TAXES AND INSURANCE): $0.00 |
| D. | AMOUNT OF FORCED PLACED INSURANCE EXPENDED BY MOVANT: Escrow-Included in 8C. |
| E. | AMOUNT OF ATTORNEYS' FEES BILLED TO DEBTOR(S) PRE-PETITION: $0.00 |
| F. | AMOUNT OF PRE-PETITION LATE FEES, IF ANY, BILLED TO DEBTOR(S): $ 35.71 |

9.  CONTRACTUAL INTEREST RATE: 4.00000% (If interest rate is (or was) adjustable, please list the
rate(s) and date(s) the rate(s) was/were in effect on a separate sheet and attach the sheet as an exhibit to this
form; please list the exhibit number here: .)

10. PLEASE EXPLAIN ANY ADDITIONAL PRE-PETITION FEES, CHARGES OR AMOUNTS CHARGED TO
DEBTOR'S/DEBTORS' ACCOUNT AND NOT LISTED ABOVE:  Less Funds on Hand $(-4,123.96)

(If additional space is needed, please list the amounts on a separate sheet and attach the sheet as an exhibit to
this form; please list the exhibit number here: _____.)

### AMOUNT OF ALLEGED POST-PETITION DEFAULT
### (AS OF MAY 7, 2018)

11. DATE LAST PAYMENT WAS RECEIVED: December 17, 2017

12. ALLEGED TOTAL NUMBER OF PAYMENTS DUE POST-PETITION FROM FILING OF PETITION THROUGH
PAYMENT DUE ON MAY 1, 2018: 5 payments

13. PLEASE LIST ALL POST-PETITION PAYMENTS ALLEGED TO BE IN DEFAULT:

| ALLEGED PAYMENT DUE DATE | ALLEGED AMOUNT DUE | AMOUNT RECEIVED | AMOUNT APPLIED TO PRINCIPAL | AMOUNT APPLIED TO INTEREST | AMOUNT APPLIED TO ESCROW | LATE FEE CHARGED (IF ANY) |
|---|---|---|---|---|---|---|
| 1/1/2018 | $2,886.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2/1/2018 | $2,886.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3/1/2018 | $2,886.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 4/1/2018 | $2,886.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 5/1/2018 | $2,866.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $14,433.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

14. AMOUNT OF MOVANT'S ATTORNEYS' FEES BILLED TO DEBTOR FOR THE PREPARATION, FILING AND PROSECUTION OF THIS MOTION: $850.00

15. AMOUNT OF MOVANT'S FILING FEE FOR THIS MOTION: $181.00

16. OTHER ATTORNEYS' FEES BILLED TO DEBTOR POST-PETITION: $0.00

17. AMOUNT OF MOVANT'S POST-PETITION INSPECTION FEES: $0.00

18. AMOUNT OF MOVANT'S POST-PETITION APPRAISAL/BROKER'S PRICE OPINION: $0.00

19. AMOUNT OF FORCED PLACED INSURANCE OR INSURANCE PROVIDED BY THE MOVANT POST-PETITION: $0.00

20. SUM HELD IN SUSPENSE BY MOVANT IN CONNECTION WITH THIS CONTRACT, IF APPLICABLE: $(-181.62)

21. AMOUNT OF OTHER POST-PETITION ADVANCES OR CHARGES, FOR EXAMPLE TAXES, INSURANCE INCURRED BY DEBTOR ETC.: Proof of Claim- $500.00; Review of Plan/Notice of Appearance- $150.00; Payment History Review Fee - $250.00

## REQUIRED ATTACHMENTS TO MOTION

Please attach the following documents to this motion and indicate the exhibit number associated with the documents.

    (1)  Copies of documents that indicate Movant's interest in the subject property. For purposes of example only, a complete and legible copy of the promissory note or other debt instrument together with a complete and legible copy of the mortgage and any assignments in the chain from the original mortgagee to the current moving party. (Composite Exhibit B.)

    (2)  Copies of documents establishing proof of standing to bring this Motion. (Composite Exhibit B.)

    (3)  Copies of documents establishing that Movant's interest in the real property or cooperative apartment was perfected. For the purposes of example only, a complete and legible copy of the Financing Statement (UCC-1) filed with either the Clerk's Office or the Register of the county the property or cooperative apartment is located in. (Composite Exhibit B.)

**CERTIFICATION FOR BUSINESS RECORDS**

I CERTIFY THAT THE INFORMATION PROVIDED IN THIS FORM AND/OR ANY EXHIBITS
ATTACHED TO THIS FORM (OTHER THAN THE TRANSACTIONAL DOCUMENTS ATTACHED
AS REQUIRED BY PARAGRAPHS 1, 2 AND 3, IMMEDIATELY ABOVE) IS DERIVED FROM
RECORDS THAT WERE MADE AT OR NEAR THE TIME OF THE OCCURRENCE OF THE
MATTERS SET FORTH BY, OR FROM INFORMATION TRANSMITTED BY, A PERSON WITH
KNOWLEDGE OF THOSE MATTERS, WERE KEPT IN THE COURSE OF THE REGULARLY
CONDUCTED ACTIVITY; AND WERE MADE BY THE REGULARLY CONDUCTED ACTIVITY AS
A REGULAR PRACTICE.

I FURTHER CERTIFY THAT COPIES OF ANY TRANSACTIONAL DOCUMENTS ATTACHED TO
THIS FORM AS REQUIRED BY PARAGRAPHS 1, 2 AND 3, IMMEDIATELY ABOVE, ARE TRUE
AND ACCURATE COPIES OF THE ORIGINAL DOCUMENTS. I FURTHER CERTIFY THAT THE
ORIGINAL DOCUMENTS ARE IN MOVANT'S POSSESSION, EXCEPT AS FOLLOWS:

**DECLARATION**

I,    Javier Rivera    Contract Management Coordinator
OF Ocwen Loan Servicing, LLC as servicer for U.S. Bank National Association, as Trustee, for the C-
BASS Mortgage Loan Asset-Backed Certificates, Series 2007-CB3 ("MOVANT"), HEREBY DECLARE
(OR CERTIFY, VERIFY, OR STATE) PURSUANT TO 28 U.S.C. SECTION 1746 UNDER PENALTY
OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON PERSONAL
KNOWLEDGE OF THE MOVANT'S BOOKS AND BUSINESS RECORDS.

EXECUTED AT WEST PALM BEACH, FLORIDA

ON THIS 15 DAY OF May , 20 18 .

NAME: Javier Rivera
TITLE: Contract Management Coordinator
MOVANT: Ocwen Loan Servicing, LLC as
servicer for U.S. Bank National Association, as
Trustee, for the C-BASS Mortgage Loan Asset-
Backed Certificates, Series 2007-CB3
ADDRESS: c/o Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409

# EXHIBIT "D"



# Property Description Report For: 49 Ramblewood Dr, Municipality of Newburgh

*No Photo Available*

| | |
|---|---|
| **Status:** | Active |
| **Roll Section:** | Taxable |
| **Swis:** | 334600 |
| **Tax Map ID #:** | 117-3-16 |
| **Property Class:** | 210 - 1 Family Res |
| **Site:** | RES 1 |
| **In Ag. District:** | No |
| **Site Property Class:** | 210 - 1 Family Res |
| **Zoning Code:** | - |
| **Neighborhood Code:** | 40412 |
| **School District:** | Newburg |

| | | | |
|---|---|---|---|
| **Total Acreage/Size:** | 144 x 232 | | |
| **Land Assessment:** | 2017 - $9,600 | **Total Assessment:** | 2017 - $103,200 |
| **Full Market Value:** | 2017 - $299,700 | | |
| **Equalization Rate:** | ---- | **Property Desc:** | Lt 40 Fostertown Crossing Sec 4 Map 264-99 |
| **Deed Book:** | 5472 | **Deed Page:** | 184 |
| **Grid East:** | 618349 | **Grid North:** | 991979 |

## Area

| | | | |
|---|---|---|---|
| **Living Area:** | 2,352 sq. ft. | **First Story Area:** | 1,176 sq. ft. |
| **Second Story Area:** | 1,176 sq. ft. | **Half Story Area:** | 0 sq. ft. |
| **Additional Story Area:** | 0 sq. ft. | **3/4 Story Area:** | 0 sq. ft. |
| **Finished Basement:** | 0 sq. ft. | **Number of Stories:** | 2 |
| **Finished Rec Room** | 0 sq. ft. | **Finished Area Over Garage** | 0 sq. ft. |

## Structure

| | | | |
|---|---|---|---|
| **Building Style:** | Colonial | **Bathrooms (Full - Half):** | 2 - 1 |
| **Bedrooms:** | 4 | **Kitchens:** | 1 |
| **Fireplaces:** | 1 | **Basement Type:** | Full |
| **Porch Type:** | Porch-coverd | **Porch Area:** | 200.00 |
| **Basement Garage Cap:** | 2 | **Attached Garage Cap:** | 0.00 sq. ft. |
| **Overall Condition:** | Good | **Overall Grade:** | Average |
| **Year Built:** | 2000 | | |

## Owners

| | |
|---|---|
| Larry Williams<br>49 Ramblewood Dr<br>Newburgh NY 12550 | Marilyn Williams<br>49 Ramblewood Dr<br>Newburgh NY 12550 |

## Sales

| Sale Date | Price | Property Class | Sale Type | Prior Owner | Value Usable | Arms Length | Addl. Parcels | Deed Book and Page |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| 3/7/2001 | $231,820 | 311 - Res vac land | Land & Building | Rieger Homes Inc | Yes | Yes | No | 5472/184 |
| 3/6/2001 | $10 | 311 - Res vac land | Land & Building | Deercreek Corporation | No | No | No | 5472/181 |

## Utilities

| **Sewer Type:** | Comm/public | **Water Supply:** | Comm/public |
| **Utilities:** | Electric | **Heat Type:** | Hot wtr/stm |
| **Fuel Type:** | Oil | **Central Air:** | Yes |

## Improvements

| Structure | Size | Grade | Condition | Year |
|---|---|---|---|---|
| Porch-coverd | 200.00 sq ft | Average | Good | 2000 |
| Misc. imprv. | 1000 × 0 | Average | Good | 2000 |
| Porch-open/deck | 168.00 sq ft | Average | Good | 2002 |
| Shed-machine | 100.00 sq ft | Average | Good | 2002 |
| Porch-open/deck | 0 × 0 | Average | Good | 2002 |

## Special Districts for 2017

| Description | Units | Percent | Type | Value |
|---|---|---|---|---|
| FD008-Cronomer vly fire | 0 | 0% | | 0 |
| WD001-Consol wtr 1 | 0 | 0% | | 0 |
| WD002-Consol wtr 2 | 0 | 0% | | 0 |

## Exemptions

| Year | Description | Amount | Exempt % | Start Yr | End Yr | V Flag | H Code | Own % |
|---|---|---|---|---|---|---|---|---|
| 2017 | BAS STAR | $13,190 | 0 | 2001 | | | | 0 |

## Taxes

| Year | Description | Amount |
|---|---|---|
| 2018 | County | $3,566.00 |
| 2017 | County | $3,432.27 |
| 2017 | School | $8,193.60 |

**\* Taxes reflect exemptions, but may not include recent changes in assessment.**